### WING v. SMITH.  (No. 6498.)

(Supreme Court, Appellate Division, First Department.   December 11, 1914.)

Appeal from Special Term, New York County.

Action by Thomas E. Wing, as trustee, against Delevan Smith. From an order sustaining a demurrer to certain defenses in the amended answer, the defendant appeals.   Affirmed.

Argued before INGRAHAM, P. J., and LAUGHLIN, SCOTT, DOWLING, and HOTCHKISS, JJ.

Charles A. Decker, of New York City, for appellant.
Burt D. Whedon, of New York City, for respondent.

PER CURIAM.   Order affirmed, with $10 costs and disbursements. See 163 App. Div. 890, 147 N. Y. Supp. 1150.

HOTCHKISS, J. (dissenting).   The action is brought to enforce defendant's liability on a so-called subscription agreement dated September 1, 1907.   When the case of This Plaintiff v. Stringer, 163 App. Div. 890, 147 N. Y. Supp. 1150, which involved similar, if not identical, issues, was before us, I was unable to concur in the decision, but I did not record the grounds of my dissent.   Now that the question of the plaintiff's right to recover is again presented, I think it proper to express the views I take of the case.   The facts alleged or necessarily to be inferred from the pleadings and the exhibits attached thereto are in substance as follows:

The subscription agreement recites that defendant and his associate subscribers were owners in severalty of 2,000 shares of the stock of Refugio Syndicate (a New Jersey corporation, which I shall hereinafter term the Refugio Company); that the subscribers desired to purchase 8,000 additional shares of stock of the same company, which shares were the entire remaining authorized capital stock thereof, and for the purpose of providing the purchase price the subscribers nominated and appointed certain individuals as managers, and severally authorized these managers to borrow on their (the managers') note, payable "not earlier than March 1, 1909," a sum not exceeding $800,000, for the account of the subscribers severally, and to pledge as security therefor the 2,000 shares owned and the 8,000 shares to be purchased, and also the subscription agreement and the several liability of the subscribers thereon; also that the note or obligation so to be given by the managers for such loan should be binding upon the several subscribers, to the extent of their several subscriptions, which they agreed

to pay on calls therefor to be made by the managers; but no call was to be made before January 1, 1909, unless on consent of 75 per cent. in amount of the subscribers and then on 30 days' notice, and no call was to exceed 15 per cent.' of the several subscriptions. After January 1, 1909, calls were to be at the discretion of the managers on 30 days' notice; on payment of his subscription, each subscriber was to receive Refugio Company stock to the par value of $1,000 for each $800 subscribed, thus calling for a total of 10,000 shares. Thereafter the managers subscribed for and purchased directly from the Refugio Company the 8,000 shares of stock, and for the purpose of raising the moneys to pay therefor the managers entered into a trust agreement with the Guardian Trust Company, under the provisions of which instrument the plaintiff claims to act as substituted trustee. This instrument, dated March 2, 1908, recites the execution of the subscription agreement, the acquisition thereunder by the managers of the said 2,000 shares, and their acquisition from the Refugio Company of the 8,000 shares, which latter shares they had exchanged for voting trust certificates; that "for the purpose of discharging their duties as syndicate managers" (which I take it means to pay for the 8,000 shares) the managers desired to borrow $800,000, to be evidenced by their one-year note for that amount payable to bearer, the payment of which note to the holder thereof they desired to secure by pledging all of said shares (or voting trust certificates therefor), together with the said subscription agreement (including the obligations of the subscribers thereunder), for which purpose they assigned all of said collateral to the Trust Company, for the following purposes,. among others: (1) On receipt of the pledged securities, the trustees shall certify and deliver on the order of the managers *the* aforesaid note for $800,000, the form of which is set forth at length in the trust agreement. (2) All moneys to be paid by the subscribers on account of the subscription agreement shall, as long as the note is unpaid, be received by the trustee. (3) Until the note is paid, any subscriber may pay to the trustee the amount of his subscription, and shall thereupon be entitled to receive the certificates for shares to which he is entitled by virtue of the subscription agreement, and all moneys so received shall be held and applied by the trustee on account of the note. (4) On default in the payment of the note, the Trust Company is authorized. (a) to require the managers to make calls for unpaid subscriptions, and in the event the calls are not made, or, if made, are not paid, the trustee is authorized to itself enforce payment of such calls; (b) to sell all stock remaining in its possession; (c) all moneys received by the trustee by virtue of the trust agreement to be held and paid by it to the holder and owner of .the note.

It is proper here to call attention to the fact that it is not expressly alleged that the note at its inception was delivered directly to the Refugio Company in payment for the 8,000 shares, but from the recitals contained in the participation certificate agreement of even date with the trust agreement last above referred to, and to the terms of which participation certificate agreement I shall shortly allude, and from the allegation of the complaint that, on the cancellation of said participation certificate agreement, the note was *"redelivered"* by the Trust

Company to the Refugio Company, and from the allegations in one of the defenses demurred to that the note was given to the Refugio Company in payment for the stock, it is necessarily to be inferred that the Trust Company, purporting to act under the trust agreement, was a mere conduit through which the note passed from the managers to the Refugio Company in payment for said shares. The participation certificate agreement to which I have referred, as I have said, was of even date with the trust agreement, and was entered into between the Refugio Company and the Trust Company. It recites the execution and delivery by the managers to the Trust Company of the aforesaid note in pursuance of the said trust agreement; that the Refugio Company "has purchased and is the owner of said note," and desires to sell to third parties participations or interests therein, for which purpose the Refugio Company *sells* the note to the Trust Company, to hold the same, together with the collateral pledged therefor, in trust for the equal benefit of all holders of participation certificates in said note, which certificates are to be issued by the Trust Company as and when requested by the Refugio Company. With respect to this participation certificate agreement, and the certificates thereunder, the complaint alleges that, after the issuance of "certain" thereof by the Trust Company, holders of such certificates surrendered the same for cancellation, and accepted in lieu thereof participation certificates issued directly by the Refugio Company, and that the participation certificate agreement between that company and the Trust Company was canceled, and the said note was *"redelivered"* by the Trust Company to the Refugio Company. It is further alleged that, simultaneously with the cancellation of the said participation certificate agreement, the Trust Company resigned as trustee under the trust agreement of March 2, 1908, between the managers and the Trust Company, and that plaintiff was substituted as trustee thereunder, and that thereafter the said $800,000 note was sold and delivered to one McDougall, "subject to the aforesaid outstanding participations therein."

Among the defenses contained in the amended answer is one which alleges that the aforesaid note of $800,000 was given directly by the managers to the Refugio Company in payment of its aforesaid subscription for said 8,000 shares, which it is alleged was a violation of the New Jersey statute providing that nothing but money or property shall be "considered as payment of any part of the capital stock of a corporation," for the violation of which statute each stockholder is, in case of the insolvency of the company, liable to make up any deficiency between the actual amount of his payment and the par value of the stock obtained in consideration thereof, so far as may be necessary to satisfy the creditors of the company. Another defense is that the Refugio Company had not complied with section 15 of the General Corporation Law of this state (Consol. Laws, c. 23), and hence was not authorized to transact business or to recover upon contracts made herein. Plaintiff having demurred to the sufficiency of these defenses, such demurrer was sustained, and from the order sustaining the same, this appeal is taken.

With respect to the defense last referred to, it is sufficient to say that the action is brought to enforce defendant's liability to the man-

150 N.Y.S.—29

agers in pursuance of the subscription agreement, and is not brought upon any contract made with the Refugio Company. For this reason, I think this defense bad. I think, however, that the defense resting upon the New Jersey statute is good. Further than this, I think the complaint itself is insufficient, and states no cause of action, an objection which it is, of course, competent to be urged against any demurrer by the plaintiff to the answer or to any defense therein.

Reduced to its main features, the situation is this: Wishing to purchase 8,000 shares of Refugio Company stock, defendant and his associate subscribers appointed agents or managers, to whom they gave authority to borrow $800,000 to pay for the shares, which loan should be payable not earlier than March 1, 1909, and as security for the note which the managers were authorized to give as evidence of the proposed loan, and for the payment of which note each subscriber assumed liability for a pro rata sum, the managers were authorized to pledge the shares to be purchased, together with the liability assumed by the subscribers to pay therefor. Instead of procuring any loan, the managers executed their bearer note for $800,000 and delivered the same to the Trust Company, under an agreement by which the Trust Company was to certify and deliver the note on the order of the managers as soon as the Trust Company should come into possession of the collateral proposed to be pledged as security for the note, to wit, the shares of stock (or voting trust certificates therefor) and the syndicate subscribers' obligations under their aforesaid agreement to pay therefor, the Trust Company to hold the pledged collaterals as security for the note, into whosesoever hands the same might come. Having arranged with the Refugio Company itself to accept the note, the managers received the stock direct from the company, and deposited it (or the voting trust certificates), together with the other collateral (the subscription agreement on which this action is brought), with the Trust Company, and the Trust Company certified and delivered the note to the Refugio Company. This note was afterwards sold, and now plaintiff, as substituted trustee, is, for the benefit of the holder of the note, seeking to enforce defendant's liability under the subscription agreement.

Reducing the matter to its final analysis, I think we may disregard the Trust Company, and the plaintiff, its successor, the trust agreement, the delivery of the note to the Trust Company, and the pledge to it of the shares (or the certificates), together with the subscribers' liability under their subscription agreement, and regard the transaction as one directly between the principals. So regarded, it comes to this: Instead of procuring any loan, the managers gave their note for the 8,000 shares directly to the Refugio Company, and as security for the note delivered to that company the 10,000 shares, together with an assignment of the subscription agreement, including the managers' right to compel the subscribers to pay the amounts they had subscribed to liquidate the loan which the managers were authorized to make in their behalf; that the Refugio Company sold the note, retaining the collaterals for the benefit of the holder thereof, who now brings suit on the note. Reduced to these simple elements, it seems to me clear that, when the managers assumed to make and deliver

their note directly to the Refugio Company, they acted beyond the scope of their authority, and for this reason the note is unenforceable. But it is said: The purpose of the subscribers in authorizing the managers to make their note was to buy the stock. What difference can it make whether the managers made their note, procured a loan and paid the proceeds to the Refugio Company, or gave their note directly to the company and thus obtained the stock? Thereafter it was only necessary for the subscribers to pay as they had agreed, and the company would have received the full amount of the note.

It will not be denied that the rule which requires us to strictly construe the authority conferred upon the managers cannot be satisfied by the application of the doctrine of equivalents, if there was any material variance between the transaction authorized and that which in fact took place. That there was such a variance seems to me plain. Had the managers pursued the course they were authorized to pursue, had they in fact borrowed $800,000, and paid that amount to the Refugio Company, they would have received therefor fully paid stock in a company with that amount of cash in its treasury, which money would have been available for its corporate uses from the moment of its receipt. The note in question, which was not due until one year from its date, could not provide the Refugio Company with any money whatever prior to its due date, except as and when payments might voluntarily and at their election be made by the subscribers, and how much, if anything, the company should ultimately receive on the note would wholly depend upon the extent to which the several subscribers might pay their subscriptions. As I have shown, under the subscription agreement the obligation of the subscribers was several; each subscriber being liable for his own subscription only. Therefore, to the extent that the several subscribers failed to pay, the company would fail to receive cash, and to that extent the intrinsic value of the corporate stock coming to those who did pay would be depreciated. To illustrate: Suppose but one subscriber had paid, and from him the company had received $10,000; is it not apparent that this stock would have represented very much less practical value than if it had been an equal amount of stock in a company with its capital fully paid, and at least $800,000, instead of $10,000, cash in its treasury? Had the managers pursued the only course they were authorized to pursue, had they borrowed and paid to the Refugio Company the full sum of $800,000, no such state of affairs as that recited in my illustration would have been possible.

The same facts which support the argument that the course pursued by the managers was essentially different from that which they were authorized to pursue also, in my opinion, show that the act of the managers in attempting to subscribe for and purchase directly from the Refugio Company its shares of stock, and to pay therefor in the note of the managers, was clearly in violation of the New Jersey statute, which says that "nothing but money shall be considered as payment of any part of the capital stock of any corporation organized under" the act under which the Refugio Company was organized, and a violation of which act burdens each stockholder whose subscription

offends the statute with a liability as hereinbefore stated. In making their subscription, the managers acted or purported to act as agents for the several subscribers to the syndicate agreement, and any stock which came into the hands of the managers by reason of such subscription was subject to the obligations imposed by the statute. While it is true that no subscriber could obtain actual possession of his pro rata proportion of the stock subscribed for until he paid the amount of his subscription, which payment might possibly, so far as he was concerned, have been a payment in full for the stock, and would have thereafter exonerated him from liability under the statute, until such payment was made, possession of the stock in the hands of the managers, or in the hands of the trustee to which it was pledged as security for the note, would have rendered the several subscribers liable under the statute, they being the equitable or beneficial owners of such stock (their title being subject only to the legal title of the managers and to the pledge). I conceive it to be no answer to this proposition to say that the stockholders might at their election have at any time put an end to this liability by paying their subscriptions, because the subscribers were under no obligation to pay their subscriptions until the note was due, which was not until one year after its date, during all of which period the subscribers would have been open to the liabilities imposed by the statute.

The fact that the act of the managers in using the note to pay for the stock was a violation of the statute also furnishes an additional ground for holding that such use of the note was a material departure from the authority conferred upon the managers by the subscription agreement, because that agreement authorized the managers to buy stock for cash only, and did not authorize them to acquire stock in such manner as would throw upon the subscribers responsibilities such as were involved in taking stock in violation of the statute.

There is still a further ground on which the complaint may be open to attack. In the trust agreement of March 2, 1908, between the managers and the trust company, under which agreement plaintiff is acting as substituted trustee, and which is an exhibit attached to and made part of the complaint, it is recited that all of said 8,000 shares of stock have been "deposited" by the managers "pursuant to a voting trust agreement bearing date the 1st day of October, 1907," and that the managers have "accepted the voting trust certificates of the voting trustees therefor," which certificates the managers assumed to deposit with the trust company in lieu of the actual shares of stock as part collateral for the $800,000 note. A careful inspection of the subscription agreement reveals nothing to indicate that the managers were authorized by the subscribers to buy voting trust certificates, or, having subscribed for or purchased 8,000 shares of Refugio Company stock, that they were authorized to surrender possession of the same and accept voting trust certificates in lieu thereof, or to enter into any species of voting trust agreement with respect thereto. Nor does the complaint allege that the managers were ever given any such authority. That voting trust certificates are not the equivalent of stock would seem to need no argument.

This objection to the complaint was not, however, developed on the argument, and as, in my opinion, sufficient grounds have been otherwise shown for reversing the order, I will not discuss it.

The order should be reversed, with $10 costs and disbursements, and the motion denied, with $10 costs.